## PAGE vs. HILL.

1. The vendee is not tenant under, but is an adverse claimant against his vendor, and may dispute his title, or set up against him or those claiming under him, an outstanding title.

2. The title of a purchaser under execution relates back to the time at which the lien attached, and he will be entitled to all the rights of the defendant at such time.

3. If at the time the lien attached, the defendant in the execution was in possession, as against the purchaser under execution, the title of defendant cannot be disputed, nor can an outstanding title be set up to defeat his recovery of possession.

4. But if defendant in the execution had not possession at the time the lien attached, but had conveyed the land by deed, although the same be not recorded, his vendee will be deemed as holding adversely to him, and will be entitled to dispute his title, or to set up an outstanding title to defeat a recovery by a purchaser under execution; although as against the title of such purchaser the unrecorded deed will be void.

5. The vendee of the defendant in the execution claiming under a deed made subsequent to the attaching of the lien, can not, however, make such defence, but is regarded as tenant under the defendant.

6. Where the original owner of land in New Madrid injured by earthquakes, sells such land, a location of other land made in lieu thereof, subsequently to such sale, vests the title to such located land in the vendee as the legal representative of such original owner, and although the deed be not recorded, it is valid between the parties, and any conveyance of the located land made by the original owner, will be inoperative, the title to such land never having vested in such original owner.

7. Nor would a deed made by the original owner after such location conveying the injured land to a third person, vest the title to the located land in such person, as the representative of the original owner.    *Que.* as to the effect of such conveyance?

## APPEAL from St. Louis Court of Common Pleas.

SPALDING & TIFFANY, *for Appellant, insist:*

I. The first and main question arises on the instruction given for the plaintiff below, to-wit, *that the deed from Martin Coontz to Tanner, does not rebut the prima facie evidence of title in Coontz, in the land located under the New Madrid certificate.* The act of Assembly of Feb. 11, 1839, (see p. 40 of acts 1838–9,) provides that, "the certificate shall be only *prima facie* evidence of title in the grantee therein named," &c., and then it is provided that that title may be rebutted by showing that the grantee named in the certificate was not the owner of the injured lands, at the time the certificate issued. This instruction asserts that the deed of Coontz to Tanner did not rebut the *prima facie* case made out by the certificate; in other words, *did not convey to Tanner the injured land on which said certificate No. 145 issued.* It amounts to the instruction in so many words, *that there was no evidence before the jury that the land conveyed by Coontz to Tanner was the same land as the tract in lieu of which said certificate issued.* We assert on the contrary, that there was evidence to go to the jury, that Coontz had, before the certificate issued, conveyed away the injured land; and thus in the language of the act just cited, *was not at the time said certificate issued, the owner of the injured lands in lieu of which the certificate issued.*

It must be borne in mind that the same act, sec. 3, enacts, that the title to the land located by virtue of the New Madrid certificate shall be determined according to the equitable rights of the parties to the land as located by virtue thereof.

On this point it is asserted by the appellant *that there was evidence, ample to go to the jury, showing that Coontz was not the owner of the injured land at the time the certificate issued, viz:*

1. The deed itself from Coontz to Tanner describing the land as in the New Madrid certificate, to-wit, 640 *acres on the bayou St. John in New Madrid.* This deed was made by Coontz under whom the plaintiff below claimed by a subsequent deed. Its statements and recitals are therefore *evidence* against him. I do not say estoppels.

2. The certificate states that the land mentioned therein was materially *injured by earthquakes.* The deed of Coontz to Tanner recites the same of the tract conveyed therein.

*Page vs. Hill.*

3. In the certificate the recorder of land titles says, that the land mentioned therein "appears by the books of his office to be owned by Martin Coontz," and in the deed of Coontz to Tanner, it is stated that the tract therein conveyed was claimed by Martin Coontz in his name before the board of commissioners, as appears by the records of said recorder's office; and in the deed of Tanner to McKnight and Brady, it is stated to be the same tract *originally claimed by and confirmed* to said Coontz.

4. The Coontz deed to Tanner was made in contemplation of taking the benefit of the act of Congress of 17th February, 1815, and so states, and authorizes in so many words, the said Tanner to proceed under that act and locate land according to it, &c.

5. McKnight and Brady to whom the same land, and right of location was conveyed by Tanner, located the certificate and procured the survey. This circumstance coupled with the fact, that the certificate did not issue till after Coontz conveyed the land to Tanner, is strong to show that the certificate itself issued on this land. It is evident then, that the grantee of Coontz under this deed, procured the certificate to issue, and procured it to be located.

6. The lapse of time from the location of the certificate in 1818, to the date of the deed of Coontz to Lewis, under whom the plaintiff below claimed, connected with the consideration—$1000 *only for 640 acres, worth several hundred dollars an acre—and without warranty.*

7. Coontz could not have the right of location to but 640 acres. See act of Congress of Feb. 27, 1815, sec. 11.

II. The appellant has proved a conveyance by Coontz to Tanner of 640 *acres lying in New Madrid county, on the bayou St. John, which had been presented for confirmation, and which had been injured by earthquakes;* with authority to Tanner, the grantee, to take the necessary steps under the act of Congress and locate said lands. A certificate of new location soon afterwards issues in lieu of a tract of land—having precisely the description and incidents just specified; shortly after McKnight and Brady, (Tanner's grantees,) have possession of that certificate, and locate the same near St. Louis. *Now*, it is asserted for the appellant that the burden is on the appellee to throw doubt or suspicion upon the identity of the land, by proving that Coontz owned another 640 acre tract, situate on the bayou St. John, in New Madrid county, which was laid before the old board of commissioners by Martin Coontz, as claimant, and which was materially injured by earthquakes; that this is an affirmative fact; and that the appellant is not bound to prove that there was no other tract of that description except the one conveyed by Coontz to Tanner.

III. The fact that the deed of Martin Coontz to Tanner was not duly acknowledged, cannot affect the title of the newly located land. This fact is a matter entirely between Coontz or rather Tanner and the United States, as the law was then, if the deed was not duly proved, or acknowledged and recorded, and the grantor should make another deed of the *same land* to a person *bona fide* and for value, the second deed would carry the title. But the law was not, and never has been, that if a deed is not duly proved or acknowledged and recorded, that the same shall be void as to a subsequent purchaser of another piece of land. The act of 1st October, 1804, governs the case. It is totally different from the present law which makes deeds void as *to all persons,* unless duly proved and recorded. That act only makes such deeds void as to *subsequent purchasers* or *mortgagees;* leaving it as at common law, or rather to the general law in force as to all other persons. Coontz has made no second deed of that land in New Madrid. The United States are satisfied with the title of it as derived by them through his deed to Tanner.

Tanner being then the owner of the land at New Madrid, obtained the New Madrid certificate and the same was located, and thereupon the title of the tract at New Madrid vested in the United States, by the act of Congress, and the right to the newly located land vested in McKnight and Brady, the assignees of Tanner. The land in New Madrid had been given up to the United States, and the United States in consideration thereof, had given the newly located land, which of course in equity, belonged to the party who had paid for it; that is, Tanner or his assigns who had parted with their title to the 640 acres in New Madrid.

Thus the title to the newly located land when it emanated from the United States, vested either

in McKnight & Brady or in Coontz for their benefit. In this action the equitable title is in ques-tion, and the decision is to be accordingly. See p. 40 of acts of Assembly of 1838-9, and Rev. Code of 1845, p. 142, sections 12 & 13, whereby it appears that our Assembly considered the legal title of the newly located land as vesting *prima facie* in Coontz, which *prima facie* case is rebutted by showing that Coontz was not the owner of the land in New Madrid when the certificate issued of new location; and that the title to the newly *located land shall be determined according to the equitable rights of the parties.* We show conclusively whether the deed was duly acknowledged or not; that Coontz was not the owner of the land in New Madrid when the certificate issued, but that Tanner was, and of course the certificate was equitably his; and the same, both the certificate, right of location and the right to the land when located, passed to McKnight and Brady, whose deed is duly acknowledged and recorded in St. Louis county.

But it is said that Lewis, under whom Calvert derives title, bought from Coontz without notice of McKnight and Brady's equity, as in this action the court is trying the equitable title, that is, who in equity has the right, we resort to equitable doctrines; and nothing is better settled than that he who buys with notice, or what should put him upon enquiry, is held to have taken the title subject to the equity, and nothing is better settled than that every person, both in courts of law and equity, is always considered as having notice of whatever is recited in the deeds or title papers through which he derives title or claims. It needs no citation of authorities to establish points so plain. Now, Lewis claims from Coontz through this certificate No. 145, *and through the location made upon the land in question; which location was made by McKnight and Brady, in their names as representatives of Martin Coontz.* This very paper, the location of McKnight and Brady, is at the foundation of the title; on it the surveyor acted, it is officially filed in his office and communi-cated to the office of the recorder of land titles. Lewis then, when he bought, had notice by the very title papers under which he claims, (for he claims under that location, as there was no other made,) that McKnight and Brady located the land in question as representatives of Coontz, and of course, if he looked to the recorder's office of the county, he would have found the deed of Tanner to them, which refers to Coontz's deed to him. I say nothing of the lapse of time, and of the paltry consideration given by Lewis for land now worth a princely fortune, all which indi-cates notice to him of a disputed or doubtful title.

But it is said, Page, the defendant below is estopped, as D. D. Page bought out the Lewis title, (which had been conveyed to Calvert, and by him to Lucy M. Scott.) Now the deed is not made to either of the Pages; and how can a deed be an estoppel at law which is not made *by* the party nor *to* him? As a deed, it cannot have any such effect; then, does the fact, that Page thought it best to quiet the title, and to buy his peace, and that he gave a trifle to a speculator who set up a pretence to his land, work an estoppel? that is, is he prevented from setting up his good title and showing the truth, by the fact, that he bought off a trespasser who set up a claim? Is it the law that a man shall lose his land, by buying his peace, by paying a pretender a trifle to cease harrassing him? Does such an act imply an admission on the part of Page, that his own title before was had, or that Calvert's was good? Nor is the fact that Page got possession from Calvert or Scott, either taken by itself, or coupled with the deed from them to Benoist, any estoppel. The deed is in fee simple absolute for value, and the possession delivered according to it; and Page or Benoist, is not estopped from denying title in Calvert and Scott, or in those under whom they claim. Page holds adversely to every body. See case of Macklot vs. Dubreuil, 9 Mo. R., 477; see Smith's leading cases in the Law Library, under estoppels, English and American note, and the case cited in Macklot vs. Dubreuil; 3 Hill's R., 510; 7 Wheat., 535; 16 Peters R., 25; 2 Metcalf, 32; 2 Marshall, 27; 4 Littell, 274.

This is not the case of entry under execution debtor; for Calvert was not in possession, against whom alone, the executions of Hill and Thompson issued; Bates' execution was against both, but it passed nothing.

IV. The first instruction asked by the defendant below, was improperly refused. It asked the court to say that nothing passed by the sheriff's sale and deed under the judgment and execution in

the case of Bates. · The plaintiff's title was on three sheriff's deeds, and on a mechanics lien for an aliquot part of the house; the one in favor of Hill was for 59766-183025 parts of the house. The one in favor of Thompson was for 101854-183025 parts of said house, and the other, that of Bates, was supposed by the court to cover the residue, being 21805-183025 parts, whereas in reality, the award of execution as well as the execution and deed, do not describe any intelligible proportion of the property. The description in the execution and deed is, *"the eleven hundredths and ninty-one parts of one hundred of said property in said lien mentioned; to-wit, a two story frame house, &c."* That sale must of course be void for the want of a description of the interest sold. It is also said, because the description in the execution and deed, is different from that in the judgment; in which last (the judgment) execution is awarded against *"eight hundred and forty-eight hundredths of one hundredth"* of the property. So that the execution went for a different proportion than authorized by the judgment, and in neither judgment, or execution, or deed, can any person tell what interest or proportion is intended.

This instruction had it been given would have prevented a recovery of so much of the property as was not embraced in the judgments and sales under the two other liens.

The claim of Bates also was for a cause of action that was by law no *lien;* and as this appears on its face, and the lien is a record, no title could be got under it, unless on its face it could be a lien.

V. The 2 & 3 instructions asked by defendant below should have been given. It assumes the law to be, that upon a judgment against a person who was neither owner nor possessor of land at the time, materials were furnished or work done for, or upon a building, nor at the time when the contract was made for furnishing such materials or doing the work, the title cannot be affected by sheriff's sale under such judgment, in virtue of the law relating to builder's liens. 6 Mo. R., 163; Sibley, et al. vs. Casey & Biddle, Revised Code of 1835, page 108.

VI. The fourth instruction asked by defendant raises the same question as the one given for the plaintiff.

VII. The motion for new trial ought to have been sustained as the verdict is against law and evidence; saying nothing of instructions.

As to the pretended estoppel against Page, because of his alledged entry under the execution debtors, I remark, that the judgments and executions of Hill and Thompson under which alone any thing could pass, *were against Calvert alone,* and he was not then in possession, and never was in possession again; so that Page did not get possession under Calvert, nor from him, but from Scott alone. So that the rule as to estoppel in such cases does not apply. Calvert joined in the deed in order to convey all his interest in the whole Coontz tract of 640 acres, for Lewis' deed to him conveyed much more than Calvert had conveyed to Scott.

Geyer, *for Appellee.*

I. The case, as made in the Circuit Court, presented several distinct questions:

1. The legal effect of the judgments, executions, sheriff's sales, and deeds, under which the plaintiff claims, as against John Calvert and Lucy M. Scott, and those claiming under them.

2. There being evidence tending to prove that the defendant entered upon and held the land under Calvert and Scott, pending the actions to enforce the liens, whether the jury finding that he so entered, he could set up title in a third person.

3. If he could set up such title, whether he has shown such title in his father or any one else.

4. The title set up involves the interpretation and legal effect of the deed from Coontz to Tanner, as between the parties, whether it is a conveyance of the land afterwards located or a mere power to convey, and if it operates as a power, whether Tanner's deed to McKnight and Brady is a due execution of that power, so as to pass the interest of Coontz to the land located.

5. Whether the acknowledgment of the deed from Coontz to Tanner, made before a justice of the peace, is of any avail.

6. If not, whether the registry of that deed in New Madrid, without acknowledgment or proof, regarded either as a conveyance of the land in St. Louis county, or as a power to convey it, will take precedence of a conveyance of the land by Coontz to a *bona fide* purchaser, without notice, actual or implied, of that deed, there being no evidence whatever of any possession of the land by Tanner or those claiming under him, or of notice of the prior deed to Lewis, or any of those claiming under him.

7. Whether a deed from Calvert to Scott, not recorded, shall have the effect to defeat the lien of creditors created by the contract of the grantee before the deed was recorded, and the judgments, executions and sales, when neither the creditor nor the purchaser had notice of such deed.

These questions involve the interpretation of written instruments and statutes, both of the United States and of this State, and could not lawfully be referred to a jury.

No principle is better settled than that the construction of written evidences, and of laws, is exclusively with the court. Levy vs. Gadsby, 3 Cranch, 180. So of the construction of foreign laws. Sidwell vs. Evans, 1 Penn., 388.

Even where extraneous evidence is admissible to aid the construction, as it sometimes is, so far as to ascertain the circumstances under which the writing was made, and the subject matter to be regulated by it, yet the court is to direct the effect of the evidence and what shall be the construction if certain facts shall be proved. Fowler vs. Bigelow, 10 Mass., 379, 384.

It would be error to leave the construction of the written instrument to the jury. Walsh vs. Duser, 3 Bin., 337; Moore vs. Miller, 4 S. & R., 279; Dennison vs. Wertz, 7 S. & R., 372; Vincent vs. Heff, 8 do., 381; Rothe vs. Miller, 15 do., 100; Adams vs. Bells, 1 Watts, 425; Reeve vs. Leonard, 1 Mass., 91; Howe, et al., vs. Bass, 2 do., 330; McCoy vs. Lightner, 2 Watts, 347.

So it is error to give instructions referring to the jury any question of law, or involving a question of law. Fugate & Young vs. Carter, 6 Mo. R., 267; Newman vs. Lawless, ib., 279; Worth vs. Maclay, 2 S. & R., 415; Coleman vs. Roberts, 1 Mo. R., 97; Plater vs. Scott, 6 Gill & Johns. 116.

On the other hand, questions of fact must be referred to the jury, and cannot be assumed or decided by the court; it is therefore misdirection to give to the jury an instruction based upon the assumption of a fact; McEldeny vs. Flannigan, 1 Har. & Gill, 308; or to submit to them a mixed question of law and fact. Plater vs. Scott, 6 Gill & Johns., 116; McRea vs. Scott, 4 Rand., 463; Labaume vs. Dodier, 1 Mo. R., 441; Watson vs. Musick, 2 do., 47; Bryan vs. Wear & Hickman, 4 do., 106; Vaulx vs. Campbell, 8 do., 224.

II. It is wholly immaterial whether Calvert was or was not in possession of the land when the contracts were made, or during the erection of the building. Possession, without title, would not, while title, even without possession, does, authorize him to enforce a lien. The third and fourth instructions refused propose to submit to the jury the whole question of the title of Calvert, involving several questions of law, and among them the interpretation and legal effect of the deeds from Coontz to Tanner, and from Tanner to McKnight and Brady—the construction of statutes— the validity and effect of an acknowledgement before a justice in Kentucky of a deed for land in Missouri—of a registry without proof of acknowledgement, as against a subsequent purchaser —the construction of the statute giving liens to builders and material men, as against an unrecorded deed—together with the effect of notice, and what facts shall amount to notice.

III. The fourth instruction proposes to submit to the jury, not only all the questions of law in the third, but all others involved in the case, and assumes facts exclusively within the province of the jury to determine. It proposes that the jury shall decide at discretion on the validity and legal effect of all conveyances under which the defendant claims—the location and patent certificate— and that they shall disregard altogether the conveyances under which the plaintiff claims, or, what amounts to the same thing, makes the whole case depend upon the opinion of the jury touching the validity and effect of the deed from Coontz to Tanner—from Tanner to McKnight and Brady—the location by the latter, and the patent certificate—taking it for granted that the plaintiff has shown no title under Coontz, and either that the defendant did not hold under Calvert or that the deed from him to Scott defeated the lien. This instruction was properly refused because

it proposed to assume facts, and refer to the jury pure questions of law, and others involving law and fact.

IV. The judgment in favor of Bates against Calvert and Scott is conclusive as against them, and all claiming under them, subsequent to the commencement of the suit. If, therefore, the defendant entered under a purchase from Calvert and Scott, or either of them, pending the suit, he is, in respect to the title under that judgment, in no better condition than his grantors would have been had they continued the possession. The first instruction refused, either assumes that Page did not enter under the defendants in the judgment, or, that so entering, the judgment is not binding on him, and was therefore properly refused, unless the judgment or execution and sale are utterly void as against the defendants, Calvert and Scott.

V. The judgment is conclusive of the question, of lien claimed by the plaintiff, and it is not competent for the defendant in that action, or any other person in a collateral action, to dispute either the quantity and value of the work and materials, or the lien established. The lien is established by the judgment—commences from the first labor done or materials furnished, and continues though there be a change of owners—Pennoch vs. Hoover, 5 Rawle, 191—on a mortgage by the owner during the progress of the work. American Fire Ins. Com. vs. Pringle, 2 S. &R. 138.

VI. The variance between the award of execution and the execution, in respect to the proportion of interest subject to the judgment, does not render the sale void. The award of execution is amendable by the judgment, or the execution by the award. The amendment might be made even after error brought. Hickman vs. Barnes, 1 Mo. R., 110; Atwood vs. Gillispie, 4 Mo. R., 423; Cheatham vs. Tillotson, 4 Johns., 499; McNair, et al., vs. Lane, 2 Mo. R., 48.

A variance between the judgment and execution being amendable, cannot be taken advantage of on a trial for the recovery of the land sold by virtue of the execution. Jackson vs. Walker, 4 Wend., 462; Jackson vs. Anderson, ib., 474; Jackson vs. Page, ib., 585; Evans vs. Wilder, 1 Mo. R., 313; Montgomery vs. Farley & Robinson, ib., 233; Swan vs. Saddlemire, 8 Wend., 676; Jack. *ex dem.* Hunter vs. Page, 4 Wend., 585.

VII. The deed of Martin Coontz, of 27th May, 1816, does not convey, or purport to convey, to James Tanner any land thereafter to be located; on the contrary, the special powers granted in respect to the location of land under any certificate to be obtained, excludes such a condition.— It is not denied that the grantor might have conveyed the lands to be located, and it may be admitted that if the deed had contained nothing on the subject, it might be interpreted to transfer the interest in the new location under our statute. But the owner of the injured lands had undoubtedly the control of the whole subject, and his deed accepted by the grantee must be understood to have expressed his intention. In respect to the certificate and the appropriation of other lands, the deed is unequivocal, conferring a power not intended as a grant.

VIII. Whether the deed be regarded as a conveyance or as a power to convey, it is void as against Lewis and those claiming under him. It was never acknowledged or proved according to any law of this State, prior to 1841; and though recorded in New Madrid county, such recording does not operate to give a priority to the grantee, nor as notice to the subsequent purchaser from Coontz. Registration without authority of law confers no validity on instruments. Kerns vs. Swope, 2 Watts, 75; and does not effect the right of a creditor or purchaser. Murray vs. Johnson, 3 A. K. Marsh., 220; Cheney vs. Watkins, 1 H. & J., 527; Jackson vs. Colden, 4 Cow., 266; Heister vs. Fortner, 2 Bin., 400; Blood vs. Blood, 23 Pick., 80.

There is in this case no evidence whatever that Lewis or Calvert had notice of the deed from Coontz to Tanner. There was no possession by Tanner, or those claiming under him, from which to infer notice. The case, as presented by the evidence, is one of a deed not duly recorded, against a subsequent conveyance to a *bona fide* purchaser, in which the law prefers the latter.

IX. If it be assumed as proved, that Calvert had conveyed the lot in question to Lucy Scott, previous to his contract with the builders and material men, by a deed which has been lost, it will not avail the defendant, because, by statute then in force, a conveyance of land, lost or not lost, is not valid or binding except between the parties thereto, and such as have actual notice thereof,

until the same is filed for record. In this case, no deed was filed for record until September, 1842, and no evidence tending to show that either of the three plaintiffs in the judgment had any notice of such deed. The liens attached at the commencement of the execution of the contracts in April preceding. The judgments subsequently rendered, and the executions and sales related to the commencement of the lien. Pennoch vs. Hoover, 5 Rawle, 291; Anshutz vs. McClelland, 5 Watts, 487; Matlock vs. Deale, 1 Miles, 254; American Fire Ins. Co. vs. Pringle, 2 S. & R., 138. As to the judgment in favor of Bates, Mrs. Scott was a party to it, and bound by it as well as by the liens in favor of Hill and Thompson, which commenced before her purchase.

X. The defendant has shown no title in himself, and is not at liberty to set up an outstanding title in another; he entered under a contract with the defendant in the executions while the actions were pending, not only with a knowledge of the existing liens, but expressly holding subject to them. That he was the tenant of his father, Daniel D. Page, does not enlarge his rights. Daniel D. Page himself purchased the title from Calvert and Scott, subject to the lien of the plaintiff and others, and the entry was under that purchase. The wretched expedient of causing the deed to be made to another, will not serve the purpose designed of covering up the transaction and defrauding the builders and material men. Similar artifices have been before resorted to in like cases without success. The rule which prevents the defendant in the execution from setting up an outstanding title in an action by the purchaser against him, applies with equal force and reason to his substitutes, whether they appear under the guise of tenants or purchasers subsequent to the commencement of the lien. Jackson, *ex dem.*, Master vs. Buck, 10 J. R., 223; Jackson vs. Jones, 9 Cowen, 182.

A person who has entered into possession under another and acknowledged his title, cannot set up an outstanding title in a third person. Jackson, *ex dem.* Smith vs. Stewart, 6 J. R., 34; Jackson vs. Dewaltz, 7 do., 157; Turley vs. Rogers, 1 A. K. Marsh., 245; Jackson vs. Hinman, 10 J. R., 192.

The claim of title which could not be set up by Calvert or Scott, cannot be set up by Page, who came in under them. Jackson vs. Harden, 4 Johns., 202.

XI. Upon the whole record it appears that the merits of the case are with the appellee, and the judgment being for the right party, ought not to be reversed, even if it shall seem that there has been a technical misdirection. Newman vs. Lawless, 6 Mo. R., 301; Neal vs. McKinstry, 7 do., 128; Finney, et al., vs. Allen, 7 do., 416; Vaulx vs. Campbell, 8 do., 224; Harper vs. Pope & West, 9 do. 405.

An erroneous instruction which works no prejudice to a party, forms no ground for the reversal of a judgment. Bosley vs. Chesapeake Ins. Co., 3 Gill. & J., 450. To authorize a reversal, there must not only be error in the instruction, but that error must be prejudicial. Bellisime vs. McCoy, 1 Mo. R., 318; Newman vs. Lawless; Finney, et al., vs. Allen, above cited.

Where the judgment is for the right party upon the whole record, it will not be reversed, although error may have been committed. Tate vs. Barcroft, 1 Mo. R., 115; Dulie's heirs vs. Smith, do., 224; Walker, et al., vs. English, ib., 534; Paine vs. Collier & Pettus, 6 do., 321.

NAPTON, J., *delivered the opinion of the Court.*

This was an action of ejectment by Hill to recover the possession of about six acres of land lying near St. Louis. The plaintiff, Hill, obtained a verdict and judgment in the Court of Common Pleas.

The title of the plaintiff was derived from three judgments, under which the property in dispute was sold by the sheriff, and conveyed to the plaintiff as the purchaser at the sale.

*Page* vs. *Hill.*

1. A *scire facias* on a builder's lien was sued out by Hill from the St. Louis Circuit Court on the 29th September, 1842, against John Calvert. The judgment therein was rendered in St. Charles (the venue having been changed) on the 11th May, 1845, against Calvert for $296 83 debt, and $47 75 interest and costs, and execution awarded against such proportion of the property described in the *scire facias* as $296 83 bears to $915 12 1-2. The property was described in the execution as "a house which is situated in the county of St. Louis, in the township of St. Louis, about two and a half miles from the St. Louis court house, on the south side of the road leading from St. Louis to St. Charles, upon the following described piece or parcel of land, to-wit: Beginning at a stone in the middle of the main road leading from St. Louis to St. Charles, thence north, 45 degrees 30 minutes west, 7 chains 97 links, running with said road to a stake; thence south, 14 degrees 15 minutes west, 2 chains 80 links to a stake; thence south, 86 degrees east, 8 chains 42 links to a stake; thence due north 5 chains 51 links to the beginning— being part of Martin Coontz's survey, and sold by said Coontz to Chancellor Lewis, and sold by said Lewis to said Calvert; containing six acres and thirty-four hundredths of an acre, as laid down by W. H. Cozzens for said Calvert, August 13, 1843, as will appear by a plat of that date, which said land is enclosed with a board fence. The house is a frame building, fronting on the south side of the St. Charles road, about 24 feet by about 26 feet deep, two stories high, with a two story porch in front. Adjoining, on the back end, is an ell building about 48 feet long by about 16 feet wide, one and a half stories high, with an one story porch in front, and a cellar under the back end, which said house is now in possession and occupied by Lucy Maria Scott." The sheriff's advertisement under the execution offers for sale, "fifty-nine thousand three hundred and sixty-six one hundred and eighty-three thousand and twenty fifths, (59366-183025) parts of the above described property.

2. A *scire facias* on a mechanic's lien, sued out by Thompson against Calvert in St. Louis Circuit Court, and judgment rendered by the Circuit Court of St. Charles, (the venue having been changed) against Calvert for $567 20, and an execution was awarded against the same property above described, or rather such portion of it as $509 27 bears to $915 12 1-2. The advertisement of the sheriff was for the sale of the one hundred and one thousand eight hundred and fifty-four one hundred and eighty-three thousand and twenty fifth (101854-183025) part of the above described property. The return and deed describes the same fraction.

3. A suit of Bates by *scire facias* on a lien against John Calvert and Lucy M. Scott. The judgment in this case was for $109 02 1-2 debt and $17 00 damages, in St. Louis Circuit Court, and execution was awarded against the proportion of the property described in the judgment as *"eight hundred and forty-eight hundredths of one hundredth* of the whole amount of liens charged upon the property." The execution upon this judgment was against the *"eleven hundredths and ninety-one parts of one hundredth of said property.*

The sheriff's deed to Hill for the proportion stated in his judgment was executed 15th July, 1845, the sale having been on the 7th of that month. The sheriff's deed to Hill under the judgment and execution in the case of Bates, was executed the same day for the proportion of property described therein, being "the eleven hundredths and ninety one parts of one hundredth of said property." Also sheriff's deed to Erskine under Thompson's judgment, and Erskine's deed to Hill, executed 14th August, 1845, were read.

The plaintiff also introduced oral testimony, showing, that on the 15th September, 1842, Francis Page was in possession of the property in dispute, that Lucy M. Scott went into possession on 28th September, 1842, Calvert having been shortly before in possession; that Scott remained in possession until Page entered. *Calvert,* who was examined as a witness stated, that the property was in the possession of Scott in the spring of 1842, she having gotten possession from him; that the house was built in the summer of 1842 by the carpenter *Thompson;* that it was built at witness' request; that he made a deed to Scott in the spring of 1842; and that she was in possession at the time the contract for building was made by him. The deed was made the last of March or first of April, and she selected the site for the house. When he sold to her, he agreed to have the house built. That she then left St. Louis and was absent some time, and on her return said she had lost the deed, and he made her another for the same property. Calvert stated further, that he claimed the land under C. Lewis, who lives in Louisiana, and that he considered himself in possession two or three years before his sale to Scott, but had no inclosure until then, and the land was uninclosed and the people got wood there.

The defendant relied on the following title:

1. New Madrid certificate No. 145, authorizing Martin Coontz or his legal representatives to locate 640 acres of land, dated September 18, 1816.

2. Location of McKnight and Brady of the same, claiming to be "legal representatives" of said Coontz, dated May 29, 1818.

3. Survey and plat returned by Sur. Gen. to Recorder, July, 1818.

4. Patent certificate, dated November 17, 1822.

5. Deed of Martin Coontz and wife to James Tanner, dated 27th May, 1816, conveying in fee the tract of 640 acres of land lying in New Madrid county; on which the New Madrid certificate afterwards issued. This deed recites that the land was injured by earthquakes, and it authorizes Tanner to avail himself of the act of Congress of 17th February, 1815, and locate any quantity of land thereunder which the grantors of said deed might have been entitled to, for his own use and for his heirs and assigns forever, and to sell, transfer and convey the same to any person, and authorizes him to sell and convey to the United States, the said injured tract of land, &c., also gives him power to substitute others. This deed was acknowledged in Kentucky before a justice of the peace, whose official character was authenticated under the seal of a court by the clerk, and was recorded in New Madrid county on the 28th June, 1816.

6. Deed from Tanner to McKnight and Brady, dated 8th November, 1816. This deed conveys 640 acres of land, with the right and privilege of locating the same, according to the provisions of said act of Congress. "The said right and claim of land hereby conveyed being 640 acres of land originally claimed by and confirmed to Martin Coontz, and conveyed by said Coontz and his wife to the said James Tanner, as being situate on the waters of the Bayou St. John, in said late county of New Madrid; and the said James Tanner as the legal representative of the said Martin Coontz and wife, has accepted the relief offered by the aforesaid act of Congress, and procured from the recorder of land titles, a certificate No. 145, authorizing said Martin Coontz or his legal representatives to locate the said 640 acres of land on any of the public lands of the said territory, &c.; and the said James Tanner representative of the said Martin Coontz, does hereby authorize and empower the said McKnight and Brady to locate the said 640 acres of land accordingly." Then follows a covenant of warranty by said Tanner for himself, heirs, &c., to McKnight and Brady, their heirs and assigns "of the right and title of the said 640 acres of land wheresoever the same may be located as aforesaid, according to the lines and boundaries thereof, as the same may be established by final survey." This deed was acknowledged on the day of its date and recorded 15th January, 1817, in St. Louis sounty.

7. Deed of James Tanner to the legal representatives of McKnight and Brady, dated 26th June, 1843, reciting the former deed to McKnight and Brady, and the location of the 640 acres and survey thereof, and then

conveying to their legal representatives the land so located. This deed was acknowledged 3d July, 1843, and recorded on the 12th July, 1843.

It was admitted that Daniel D. Page, father of defendant, acquired by sheriff's sale and by partition made in 1829 in St. Louis Circuit Court, all McKnight and Brady's interest in 214 acres, parcel of said 640 acres, and in which portion the lot of land in controversy is located.

The plaintiff by way of rebuttal gave in evidence:

1. Deed of Martin Coontz and wife to Chancey Lewis, dated 26th October, 1840, conveying all the land located for him in his name under certificate aforesaid No. 145. The consideration expressed in this deed was $1000, and no warranty was given except against claims of the grantors and their heirs. For a particular description of the land located reference was made to the records in the office of the Recorder and Surveyor General in St. Louis, and in the General Land Office at Washington City. The said certificate was stated in the deed to be, "located in T. 45, north R. 7 east, in the county of St. Louis." This deed was recorded 7th November, 1840.

2. Deed from Lewis to John Calvert, dated 16th November, 1841, conveying to Calvert three portions of the land conveyed to Lewis by Coontz and wife, describing them by metes and bounds, containing together 117.53 acres. This deed was recorded November 16, 1841.

3. Deed of John Calvert to Lucy M. Scott, dated 13th September, 1842, and recorded the following day, conveying 6 34-100th acres by metes and bounds as follows: "Beginning at the stone in the middle of the road leading from the city of St. Louis to St. Charles; thence north 45 deg., 30 min., 7 chains, 97 links, and running with said road to a stake; thence south 14 deg., 15 min., w. 10 chains, 80 links, to a stake; thence south 86 deg., east 8 chains, 42 links, to a stake; thence due north 5 ch., 51 links, to the beginning, being part of Martin Coontz's survey, &c.

4. Deed of Calvert and L. M. Scott to L. A. Benoist without date; conveying in fee simple all their right and interest in the tract conveyed by Martin Coontz to Lewis, &c., and in the house in dispute. This deed was acknowledged on the 8th April, 1845.

The plaintiff also called John Calvert as a witness, who stated that defendant was in possession under Daniel D. Page; that he was present when said premises were delivered up to said Page; that a deed of said Scott and himself was first made out to D. D. Page, who returned it and said, he wanted it made to Benoist, and it was so made; that Page paid the consideration of the deed so made to Benoist; that Page was at liberty to resist said liens. About the time witness commenced said house, Page

came there and notified witness that he claimed the land, and Page's title under Tanner became generally known and was much canvassed.

The court gave the following instruction, at the plaintiff's instance:

"The deed from Martin Coontz to James Tanner, dated in 1816, and given in evidence in this suit does not rebut the *prima facie* evidence of title of Martin Coontz in the land located by virtue of certificate No. 145."

The court also instructed the jury on behalf of defendant, that, "there can be no recovery in this action by plaintiff, unless the jury believe from the evidence that the house in question is situate on the tract of land described in the declaration."

The court refused to give the following instructions, asked by defendant:

1. That no title passed in the house in question by the sheriff's sale and deed under the judgment and execution in the case of Bates against Scott and Calvert.

2. That no title passed in the house in question by the sheriff's sale and deed under the judgment of D. B. Hill against Calvert, given in evidence, if the jury believe from the evidence that Calvert was not the owner or possessor of the land on which the said house was built, at any time during the progress of its erection, or at the time when the contract was made with Hill for the materials furnished by him.

3. That no title in the house in question passed by the sheriff's sale and deed under the judgment and execution of Thompson against Calvert given in evidence, if the jury believe from the evidence that Calvert was not the owner or possessor of the land on which the said house was built at any time during the erection of said building, or at the time when the contract was made with said Thompson for the erection of the same.

4. If the jury believe from the evidence that Martin Coontz had no interest in the injured land (on which certificate No. 145, read to the jury, issued) at the time said certificate issued, and that the same then belonged to James Tanner, and that said Tanner conveyed his right of location thereunder to McKnight and Brady, and that they located the same, and that the patent certificate given in evidence issued on said location, then the jury are bound to find for the defendant.

The first point which arises on this record, is the position taken by the plaintiff (below,) which denies to the defendant the right to set up the outstanding title of D. D. Page under Martin Coontz. This position is based upon the principle, that a defendant in an execution, and those acquiring possession under him, cannot defeat the recovery of the pur-

11

chaser at the sheriff's sale, by setting up an outstanding title. The principle is not denied, but its applicability to this case is denied by the defendant.

The reason of this rule when applied to the defendant in the execution is obvious enough. The purchaser buys the *possession,* if nothing more, and the defendant must give up that possession. If there be an outstanding title better than that of the defendant in the execution, the proprietor of that title is in no worse condition by reason of this rule. It is as convenient for him to bring his ejectment against the purchaser as against the defendant in the execution. A person holding under the defendant in the execution, or getting possession from him stands in no better attitude than the defendant himself. He of course holds without title from the defendant, because the defendant could make no title *after the judgment* which would affect the purchaser under the execution. If he has purchased a better title than the defendants since the tenancy commenced, he cannot avail himself of this title in a suit against him by the purchaser under the execution, because he cannot deny the title of his landlord; and therefore cannot deny that title when the process of law has transferred it to another.

In this case the judgments upon which the executions issued under which the plaintiff purchased, were against John Calvert. The judgment and execution in the case of Bates against Calvert and Scott, were clearly void, because, neither the execution nor sheriff's deed conveyed any intelligible proportion of the property. The judgment was for "eight hundred and forty-eight hundredths of one hundredth of the whole amount of liens charged upon the property." The execution was against the "eleven hundredths and ninety-one parts of one hundredth of said property." The sheriff's deed conveyed the proportion of property described in the execution. Besides the fact, that the execution does not describe the proportion of property specified in the judgment, it does not give any description which can be comprehended. The purchaser, therefore, took nothing under the execution in favor of Bates.

The whole question then depends upon the fact, whether Calvert was in possession at the time these liens attached upon the property. If he was not in possession, the mechanics who filed the liens, and those deriving title under their judgments, have no right to the benefit of the rule, which precludes every one holding under the defendant in an execution from setting up an outstanding title. The reason of the rule does not apply. They have only acquired the title which Calvert had, and they must resort to the same measures to get the possession, which Calvert

must have used, if he had the *right of possession* only.   But if Calvert had the actual possession, either by himself or his tenant, then a person acquiring the possession either from Calvert or his tenant, must yield that possession to the purchaser under the executions against Calvert, although he may have purchased a better title from some other source or may be able to show that better title outstanding.

The question then recurs, was Calvert in possession of this land when these liens attached?   Calvert was not in possession himself, but Scott was in possession.   The plaintiff, however, insists that Scott's possession was that of a mere tenant under Calvert, because the deed from Scott to Calvert was *never recorded*, and was *therefore void against the holders of the liens*, and those who purchased under their judgments.   This is no doubt true, so far as any *title* under that deed is concerned.   The deed from Calvert to Scott, could not be available against the mechanics and material men, and those purchasing under their judgments, because it was not recorded before the liens attached, and the statute expressly declares that an unrecorded deed shall be void as to all the world, except the parties to it, and those having *actual* notice of its existence.   But here we must keep in view the distinction made by the act.   Though the deed from Calvert to Scott was void as to Hill and Thompson, and would constitute no obstacle to the consummation of their titles by judgments and sales, and could not be given in evidence to defeat such title, yet the deed was good between Calvert and Scott.   The deed, it will be observed, was made *before* the creation of the liens.   What was the effect of the deed, *at the time it was made?*   Did the deed and the transfer of possession which accompanied it, make Scott a tenant of Calvert?   Certainly not.   The deed conveyed the fee simple title to Scott, and she was forthwith put in possession.   Her possession under that deed was therefore adverse to Calvert, as it was to that of the rest of the world.   Scott was at liberty to dispute Calvert's title, and of course, any one purchasing from her could do the same.   This was the condition of the land, and the relations of the parties *at the time* these liens were created.   The execution and judgments relate back to this period of time, and the rights of the purchasers, under these executions, must be determined by the character of Scott's possession *at that time.*   If her possession at this period was not that of a tenant under Calvert, but as a claimant of the land in fee simple adversely to Calvert, then Calvert was not in possession, and the plaintiff bought at the sale under the executions only Calvert's right of possession; a right which Calvert himself could not have

asserted against his deed, but which the plaintiff may assert, because that deed was not recorded.

Let us substitute for the mechanic's lien an ordinary mortgage, and the distinction already adverted to will be equally obvious. Suppose that Calvert, instead of contracting liens by causing buildings to be erected upon the premises, had morgaged the property to Hill and Thompson. Previous to the mortgage, he executes an unrecorded deed to Scott, and puts her in possession under the deed. The mortgages are foreclosed, and Page becomes the purchaser under the judgments and sales, and brings his ejectment against Scott. The deed from Calvert to Scott is insufficient to protect her possession, because it is void as to the mortgages, and those purchasing under the judgments of foreclosure. But the deed from Calvert to Scott is good to show an adverse possession in Scott at the time the mortgages were executed, and consequently enables her, as an adverse claimant of the title, to protect her possession by an outstanding title.

If the deed from Calvert to Scott, had been executed *after* the liens attached, the rule, I apprehend, would have been different. Calvert being in possession by his tenant, at the time of the liens (whether they be mortgages, judgments or builders' liens) could not, by executing a deed to his tenant, convert that tenancy into an adverse possession. If the rule could be evaded in this way, it would be worthless. The relation of the parties at the time of the judgment or the lien, must control their rights and regulate their defences in the ejectment suit which may be instituted upon the title springing out of the judgment or the lien.

I have not adverted to the fact, that the deed from Calvert and Scott was made to Benoist, and not to D. D. Page, because I consider it entirely immaterial. That title, whether made to Page or Benoist, could not defeat the purchaser under the liens. It has no connexion with the question now under consideration, which relates exclusively to the possession, and is only important in determining whether the present defendant occupies a position in relation to the possession, which prevents him from defending his possession by a title under Martin Coontz, not derived through Calvert, or must give up that possession under a rule of law governing the action of ejectment, and assert that title in the character of plaintiff. Whether the deed was made to Benoist or D. D. Page, it is clear that the possession of F. Page, the defendant, was derived from Scott, and if the judgments, under which the plaintiff claims title, had been against Scott, the plaintiff would have been entitled to the benefit of the rule which has been invoked in his favor. As these judgments

were against Calvert alone, who was not in possession when the liens attached, he loses this advantage.

The principle question in this case, is in relation to the comparative value of the two titles derived from Martin Coontz. This seems to have been the only point controverted in the Circuit Court, and the only one upon which that court gave any opinion. All the instructions, both the one given and those refused, are upon this point. The Circuit Court declared Page's title insufficient to rebut the title of Calvert, derived through Lewis from Coontz. It may be well to recur to the facts.

In May, 1816, Coontz executed his deed to Tanner, conveying 640 acres in New Madrid injured by earthquakes, and authorizing Tanner to avail himself of the act of February 17, 1815, for the use of himself and his assigns. This deed was not recorded; for the record in New Madrid, upon an insufficient acknowledgment, was a mere nullity. In September following, Tanner procured from the Recorder certificate No. 145, authorizing Martin Coontz or his legal representatives to locate 640 acres of land. In November of the same year, Tanner conveyed to Mc-Knight and Brady, and authorized them to locate the 640 acres, reciting the previous deed from Coontz to himself, and that he had accepted the relief offered by the act of Congress and procured the certificate No. 145. In 1818, McKnight and Brady made the location as legal representatives of Martin Coontz. Page has the title of McKnight and Brady. In 1840, Coontz conveyed to Chancey Lewis all the land located for him under New Madrid certificate No. 145, and Calvert procured Lewis' title to so much of this land as is now in controversy.

What then would be the condition of the title, if we leave out of view the deed from Coontz to Lewis in 1840? According to the decision in the case of the heirs of Kirk vs. heirs of Greene, (10 Mo. R., 252,) where the owner of the land in New Madrid has aliened it before the certificate issued, the certificate and location under it vest the title in such alienee as the legal representative. It can make no difference in determining this point, whether the deed from Coontz to Tanner was recorded or not, if it was effectual to pass the title to the 640 acres in New Madrid, in lieu of which this certificate issued. That this deed was void as between Coontz and Tanner, whether recorded or unrecorded, cannot be disput-ed. The location, then, under certificate No. 145, vested in McKnight & Brady, the assignees of Tanner, who had purchased the land in New Madrid from Coontz, and had conveyed it to McKnight & Brady, and empowered them to make the location. When the location was made, the title to the injured lands passed to the United States.

But Coontz, in 1840, makes a second deed, attempting to convey *the located land* in St. Louis county. His deed does not convey or purport to convey the same land, which he had previously conveyed to Tanner by an unrecorded deed, but the land which had been located in lieu of it under the New Madrid certificate 145. Now, according to the decision in Kirk vs. Greene, the title to the land in St. Louis county had in 1818 passed to McKnight and Brady, and *never vested* in Martin Coontz. How can the conveyance from Coontz of the land in St. Louis county, to which he never had any title, affect his previous conveyance to Tanner of the land in New Madrid?

Had the conveyance from Coontz to Lewis been of the land in New Madrid, it is not clear that the title of McKnight and Brady would have been affected. For the act of 1815, declares that the location shall *ipso facto* operate as a relinquishment to the United States of the injured land. The question of title would then be between the United States and Lewis, and if the title of the United States should be considered as avoided by the deed to Lewis, such a result might be held to avoid the location, which was based upon it, but could not have the effect of transfering to Lewis the benefit of such location. But it is obvious, that in a controversy between McKnight & Brady and Lewis, the validity of the location could not be questioned.

The whole question then in relation to the two titles under Martin Coontz, seems to have been determined by the case of Kirk vs. Greene. For all the arguments urged in support of the title of Lewis or Calvert, are based upon the premise, that Coontz had at some period of time, the title to the located lands. Upon this assumption is based the reasoning by which the deed to Lewis is contended to have the effect of making him the legal representative of Coontz, notwithstanding the previous unrecorded deed to Tanner. The premises failing, by holding that the located lands passed to the legal representatives of Coontz in 1818, and not to Coontz himself, the argument must fall with them.

The other Judges concurring, the judgment is reversed and the cause remanded.